SHIN, J.
*56 After the plaintiffs purchased a residential property (property), they discovered that heating oil had spilled from a supply line, contaminating the property and threatening to migrate, or actually *57 migrating, to the adjacent property. Alleging that the sellers concealed the spill, the plaintiffs brought suit against them for deceit, negligence and negligent misrepresentation, and liability under G. L. c. 21E.[2] The sellers, who had declared bankruptcy, failed to answer or appear, and a default judgment entered against them. The plaintiffs then *1241 commenced this action seeking, among other forms of relief, a declaration that the sellers' homeowners insurance policy (policy) issued by Arbella Insurance Group (Arbella) covers the claims raised in the underlying lawsuit.
On the parties' cross motions, a Superior Court judge granted summary judgment in favor of Arbella, essentially on the ground that the source of the plaintiffs' injury is the sellers' act of concealing the spill, which does not qualify as an "occurrence" under the policy. On appeal the plaintiffs quarrel with the judge's decision only insofar as it relates to their claim under G. L. c. 21E. We agree with the plaintiffs that, with regard to that claim, the source of their injury is the spill itself, and not the sellers' later act of concealment, as G. L. c. 21E imposes liability based on ownership status without regard to fault. We further conclude, however, that there remains a genuine issue of material fact as to whether the plaintiffs' c. 21E damages fall within the policy exclusion for " 'property damage' ... [w]hich is expected or intended by the insured." We therefore vacate the judgment and remand.
Background. 1. Underlying complaint. The complaint against the sellers, filed in May 2008, alleged the following facts. The sellers were "owners and residents of the [p]roperty for many years." While they lived on the property, a heating oil fuel line leaked oil "over an extended period of time,"[3] causing contamination of the foundation, the ground underneath, and the groundwater. The spill also "posed an imminent threat to adjoining property or actually migrated to the adjoining property."
In June 2005 the sellers listed the property for sale. Several weeks later, their agent provided the plaintiffs with the "[s]eller's *58 [s]tatement of [p]roperty [c]ondition," which made no mention of an oil spill. The sellers thereafter accepted the plaintiffs' offer to purchase the property for $ 380,000, and the sale closed on October 28, 2005.
The day after the closing, the plaintiffs noticed a smell of oil on the property. They then discovered that rugs were concealing a sizeable oil spill that had permeated the concrete flooring. Although the sellers knew about the spill prior to the sale, they "took affirmative steps to conceal and/or prevent the plaintiffs from discovering" it. For example, they "made affirmative representations that no non-obvious conditions were present on the [p]roperty that would affect [its] value or use." As a result of the spill, the plaintiffs incurred "response costs" and "damage to their real and personal property."
2. Subsequent proceedings. In June 2009 Arbella sent the sellers a letter disclaiming coverage under the policy.[4] The default judgment against the sellers entered in December 2012. In October 2013 execution issued in the amount of $ 1,062,205.62, including interest and costs.
In March 2014 the plaintiffs commenced this action against Arbella, seeking a declaration as to coverage and seeking to reach and apply the sellers' interest in the policy to the default judgment.[5] While the *1242 complaint on its face seeks to recover the total amount of the default judgment, the plaintiffs' summary judgment opposition and cross motion identified "the basis on which the [plaintiffs] now seek to reach the Arbella policy" as "the [G. L. c.] 21E claim for which Arbella's insureds were found liable through default judgment." Similarly, on appeal, the plaintiffs represent that "[t]hey agree with the Superior Court [judge] that the [p]olicy *59 provides no coverage for deceit and misrepresentation" and that they "seek review only as to the Superior Court[ ] [judge's] conclusion as to coverage for the [G. L. c.] 21E claim." The sole question before us, therefore, is whether the policy covers the plaintiffs' claim for damages under c. 21E.
Discussion. We review the judge's decision to grant summary judgment de novo, viewing the evidence in the light most favorable to the plaintiffs. See Boazova v. Safety Ins. Co., 462 Mass. 346, 350, 968 N.E.2d 385 (2012). To prevail on summary judgment, Arbella had the "burden of demonstrating the absence of triable issues ... by showing that [the plaintiffs have] no reasonable expectation of proving an essential element of their case." Id.
"[W]here an insurer commits a breach of its duty to defend and the insured defaults, the insurer is bound by the factual allegations in the complaint ... in determining whether the insurer has a duty to indemnify." Metropolitan Prop. & Cas. Ins. Co. v. Morrison, 460 Mass. 352, 361, 951 N.E.2d 662 (2011). See Miller v. United States Fid. & Guar. Co., 291 Mass. 445, 448, 197 N.E. 75 (1935) ("Where an action against the insured is ostensibly within the terms of the policy, the insurer, whether it assumes the defense or refuses to assume it, is bound by the result of that action as to all matters therein decided which are material to recovery ..."). Here, the parties agree that, because of the sellers' default, the factual allegations of the underlying complaint must be accepted as true. Still, however, Arbella may raise any coverage defense that "is compatible with the facts to which the insurer is bound." Winbrook Communication Servs., Inc. v. United States Liab. Ins. Co., 89 Mass. App. Ct. 550, 552 n.7, 52 N.E.3d 195 (2016). This means that, while Arbella may not litigate the issues resolved by the default judgment, it is not precluded from "showing that the cause of action upon which the judgment was entered was not included in its policy of insurance." Sciaraffa v. Debler, 304 Mass. 240, 242, 23 N.E.2d 111 (1939). See Joyce v. London & Lancashire Indem. Co., 312 Mass. 354, 358, 44 N.E.2d 776 (1942) (insurer may "set[ ] up in an action against it any matter constituting a defence and not already determined in the original action").
Distilled to their essence, Arbella's defenses are that (1) the source of the plaintiffs' injury is the sellers' concealment of the spill, which is not an "occurrence" within the meaning of the policy; (2) no loss occurred during the policy period; and (3) the property damage was "expected or intended" by the sellers and is *60 thus excluded *1243 from coverage.[6] We address these arguments in turn.
1. Property damage caused by an "occurrence." The policy provides that, "[i]f a claim is made or a suit brought against an 'insured' for damages because of ... 'property damage' caused by an 'occurrence' to which this coverage applies, [Arbella] will ... [p]ay up to [its] limit of liability for the damages for which the 'insured' is legally liable." "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in ... 'property damage.' " "Property damage" is defined in turn as "physical injury to, destruction of, or loss of use of tangible property."
The plaintiffs, as the parties seeking to recover under the policy, "bear[ ] the initial burden of 'proving that the loss [is] within the description of the risks covered.' " Highlands Ins. Co. v. Aerovox Inc., 424 Mass. 226, 230, 676 N.E.2d 801 (1997), quoting Tumblin v. American Ins. Co., 344 Mass. 318, 320, 182 N.E.2d 306 (1962). The plaintiffs have met this burden. Their suit against the sellers sought damages for property damage caused by the release of oil on the property. The initial release of the oil was accidental; it thus qualifies as an "occurrence" under the policy. See Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844, 848, 616 N.E.2d 68 (1993) ( Tufts ) ("The 'occurrence' is the 'injurious exposure' to the hazardous material during the policy periods"). In addition, the original complaint alleged that the spill caused "damage to [the plaintiffs'] real and personal property." When a release of hazardous material results in property damage, as we must accept that it has here, "cleanup costs" constitute "damages within the policy language." Hazen Paper Co. v. United States Fid. & Guar. Co., 407 Mass. 689, 700, 555 N.E.2d 576 (1990). Accord Tufts, 415 Mass. at 848, 616 N.E.2d 68 ; Rubenstein v. Royal Ins. Co. of Am., 44 Mass. App. Ct. 842, 848, 694 N.E.2d 381 (1998).
We reject Arbella's contention that the source of the plaintiffs'
*61 injury is the intervening concealment of the spill by the sellers. It is true as a general matter that we must look at "the source from which the plaintiff's ... injury originates rather than the specific theories of liability alleged in the complaint" in determining coverage under a policy. New England Mut. Life Ins. Co. v. Liberty Mut. Ins. Co., 40 Mass. App. Ct. 722, 727, 667 N.E.2d 295 (1996). But we disagree with Arbella's characterization that "all of the [plaintiffs'] claims against the [sellers] were stated as intentional misconduct in deceiving the [plaintiffs] and knowingly misrepresenting the condition of the property." While that is the case with respect to the deceit and misrepresentation claims, the G. L. c. 21E claim does not depend on misconduct on the part of the sellers.[7] Chapter 21E is "a strict liability statute that imposes responsibility on the basis of status and does not *1244 require a showing of fault." Martignetti v. Haigh-Farr, Inc., 425 Mass. 294, 308, 680 N.E.2d 1131 (1997). See G. L. c. 21E, § 5 (a ) (site owner liable for property damage "without regard to fault"). Thus, the plaintiffs have incurred damages under c. 21E regardless whether the sellers deceived or misled them into purchasing the property. The injury, in other words, derives from the initial, accidental release of the oil -- which is an "occurrence" under the policy -- and not any later acts of misconduct committed by the sellers.[8]
For similar reasons we reject Arbella's contention that the underlying complaint alleged only financial harm, which is not covered under the policy. As to the c. 21E claim, the complaint plainly alleged that the plaintiffs incurred property damage and cleanup costs as a result of the spill. These are covered damages under the policy. See Tufts, 415 Mass. at 848, 616 N.E.2d 68 ; Hazen Paper, 407 Mass. at 700, 555 N.E.2d 576.
2. Loss during policy period. Arbella next argues that the policy provides no coverage because the plaintiffs did not incur their damages until after the closing of the sale. Specifically, because the policy was terminated upon the closing, Arbella argues that there was no "accident ... during the policy period" as required to establish an occurrence.
*62 This argument is foreclosed by the Supreme Judicial Court's decision in Tufts. There, the current owner of a hazardous waste site brought suit against the prior owner (Tufts) to recover cleanup and response costs under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended, 42 U.S.C. §§ 9601 et seq. (1988). See Tufts, 415 Mass. at 845-846, 616 N.E.2d 68. Although over a decade had passed since Tufts conveyed the land, the court held that Tufts's insurers had a duty to defend the lawsuit, rejecting their contention "that the proper inquiry under the[ ] policies is ... whether the entity making the claim sustained harm during the policy period." Id. at 848, 616 N.E.2d 68. Analyzing language identical in substance to that at issue here, see id. at 847-848, 616 N.E.2d 68, the court concluded that the policy did not "requir[e] that the claimant possess an ownership interest in the property at the time the damage occurred." Id. at 849, 616 N.E.2d 68. Rather, it required only "that the property damage itself occur during [the policy period]." Id. at 848, 616 N.E.2d 68. The court reasoned that the purpose of CERCLA supported this interpretation: "[S]ince CERCLA and the Massachusetts equivalent, G. L. c. 21E, attempt to place the ultimate responsibility for cleaning up hazardous waste on those entities responsible for the contamination, ... it [is] entirely logical that the insurer whose policies are in effect during the time that the property damage is alleged to have occurred be required to defend the insured." Id. at 852, 616 N.E.2d 68.
Here, the underlying complaint established that the release of the oil occurred during the sellers' ownership of the property. The "property damage itself" thus occurred while the policy was in effect. Id. at 848, 616 N.E.2d 68. This was sufficient to trigger coverage under the policy, regardless whether the property damage was "disclosed or manifested during the policy period." Id. at 853, 616 N.E.2d 68.
*1245 See Rubenstein, 44 Mass. App. Ct. at 850-851, 694 N.E.2d 381 (insurers had duty to defend prior owner of property contaminated by oil spill even though spill was not discovered until after property was sold).
3. "Expected or intended" exclusion. We turn to the exclusion for " 'property damage' ... [w]hich is expected or intended by the insured." For the sellers to have "intended" the property damage, they must have intended the damage itself, not just "the act" causing the damage, though they "need not [have] intend[ed] to cause the precise [damage] which occurred." Hanover Ins. Co. v. Talhouni, 413 Mass. 781, 784, 604 N.E.2d 689 (1992). For the sellers to have "expected" the property damage, they must have "kn[own] to a substantial certainty that the [damage] would result."
*63 Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 86, 469 N.E.2d 797 (1984). Because the exclusion is not "in the same paragraph as the coverage clause" but "in a separate and distinct part of the insurance policy," the burden is on Arbella to show that the exclusion applies. Highlands Ins. Co., 424 Mass. at 232 n.8, 676 N.E.2d 801.
While conceding that "the initial oil leak may have been an 'accident' at one time," Arbella argues that the damage ceased to be accidental and became "expected or intended" once the sellers discovered the spill and intentionally allowed it to "fester" over time. We agree that, when the sellers discovered the spill, they must have known to a substantial certainty that property damage would result. From that point forward, therefore, any further property damage was "expected," if not "intended," by the sellers. See Utica Mutual Ins. Co. v. Hamel, 46 Mass. App. Ct. 622, 625, 708 N.E.2d 145 (1999) (property damage was "expected" where evidence showed that insured "knew to a substantial certainty that ... continual waste water spills from [waste water treatment system] would cause 'some damage' to [the] premises"). See also Travelers Ins. Co. v. Waltham Indus. Lab. Corp., 883 F.2d 1092, 1098-1099 (1st Cir. 1989) (property damage was either "expected" or "intended" where insured was "notified repeatedly that ... discharges [of pollutants] were going into the sewer system and into the ground and ... did nothing effective to reduce or abate the discharge").[9]
The problem for Arbella, however, is that the summary judgment record does not establish when the sellers discovered the spill or whether the period of concealment caused additional or increased property damage. While the original complaint alleged that the oil leaked "over an extended period of time," and that the sellers knew about the spill prior to the sale of the property,[10] it is silent as to the date of discovery. Because a genuine issue of material fact thus exists, remand is required for a determination of what portion of the plaintiffs' c. 21E damages falls outside the exclusion. See Nashua Corp. v. First State Ins. Co., 420 Mass. 196, 203, 648 N.E.2d 1272 (1995) (error to grant summary judgment where "factual question exist[ed] regarding what portion of the pollution damage" fell outside pollution exclusion clause). Cf.
*64 Highlands Ins. Co., 424 Mass. at 235, 676 N.E.2d 801 (summary judgment appropriate where plaintiff had no *1246 reasonable expectation of proving damages, other than "de minimis amount," not falling within pollution exclusion).
Conclusion. For the above reasons, we vacate the judgment and remand for further proceedings consistent with this opinion.
So ordered.

G. L. c. 21E, § 5 (a ), provides, in relevant part, that "the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil ... shall be liable, without regard to fault, ... to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release."

The complaint alleged that another defendant, Bursaw Oil Corporation, installed a new supply line in the mid-1990s and failed to remove the existing line. The plaintiffs settled their claims against this defendant.

As far as it appears from the summary judgment record, the policy initially covered the period from July 15, 2003, to July 15, 2004. The policy was then renewed twice for one-year periods on July 15, 2004, and July 15, 2005. The policy terminated upon the sale of the property on October 28, 2005.

See G. L. c. 175, § 113 ("Upon the recovery of a final judgment against any person by any person ... for any loss or damage specified in the preceding section, if the judgment debtor was at the accrual of the cause of action insured against liability therefor, the judgment creditor shall be entitled to have the insurance money applied to the satisfaction of the judgment ..."); G. L. c. 214, § 3 (9) (Superior Court has jurisdiction over "[a]ctions to reach and apply the obligation of an insurance company to a judgment debtor under a ... policy insuring a judgment debtor against liability for loss or damage on account of ... damage to property, in satisfaction of a judgment covered by such policy, which has not been satisfied within thirty days after the date when it was rendered").

Arbella also contends that the policy's owned property exclusion applies. Arbella failed to raise this argument in the trial court, however, and the argument "depends on facts not established in the record." Aetna Cas. & Sur. Co. v. Continental Cas. Co., 413 Mass. 730, 735, 604 N.E.2d 30 (1992). We note also that where "there was contamination of adjacent property, the costs of remedial efforts to prevent further contamination of that property are not excluded from coverage by the owned property clause." Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 280, 675 N.E.2d 1161 (1997). See Rubenstein v. Royal Ins. Co. of Am., 44 Mass. App. Ct. 842, 853-854, 694 N.E.2d 381 (1998).

As the plaintiffs point out, Mass. R. Civ. P. 8 (e) (2), 365 Mass. 749 (1974), allowed them to plead claims in the alternative.

Arbella cites a number of cases from other jurisdictions that found no coverage with regard to claims that an insured negligently or intentionally misrepresented the condition of a property prior to a sale. See, e.g., Safeco Ins. Co. of Am. v. Andrews, 915 F.2d 500, 502 (9th Cir. 1990). But none of those cases involves a claim to recover remediation costs under a no-fault statute equivalent to c. 21E.

Cf. Lumbermens Mut. Cas. Co. v. Belleville Indus., 407 Mass. 675, 681 n.6, 555 N.E.2d 568 (1990) (construing "sudden and accidental" clause in pollution exclusion and stating that, if initial release "continues for an extended period," then "at some point, presumably, it would likely cease to be accidental or sudden").

Contrary to the plaintiffs' assertions, the c. 21E claim clearly incorporated these factual allegations.